# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ANIMAL WELFARE INSTITUTE,

      Plaintiff

   v.

NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION, *et al.*,

      Defendants

Civil Action No. 18-47 (CKK)

## Memorandum Opinion
(February 28, 2019)

This lawsuit arises from a Freedom of Information Act ("FOIA") request that Plaintiff Animal Welfare Institute made to Defendants National Oceanic and Atmospheric Administration ("NOAA") and National Marine Fisheries Service ("NMFS"). Plaintiff requested all documents from January 1, 2017 to May 1, 2017, regarding NMFS's determination that the clinical history and necropsy requirements of the Public Display Permit for an orca whale, known as "Tilikum," were extinguished by the 1994 amendments to the Marine Mammal Protection Act ("MMPA"). Defendants responded to Plaintiff's FOIA request and produced non-exempt responsive documents. The only issue currently before the Court is whether or not Defendants are required to produce a responsive 16-page draft memorandum. Defendants claim that this draft memorandum is protected under FOIA Exemption 5 which exempts from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Plaintiff argues that FOIA Exemption 5 is not applicable and that the draft memorandum is being wrongly withheld.

The parties have filed cross-motions for summary judgment on the issue of whether or not the draft memorandum falls under Exemption 5 to FOIA.[1]

Upon consideration of the pleadings,[2] the relevant legal authorities, and the record as it currently stands, the Court and GRANTS Defendants' motion for summary judgment and DENIES Plaintiff's motion for summary judgment. The Court concludes that the draft memorandum is exempt from FOIA based on Exemption 5.

## I.    BACKGROUND

In its FOIA request, Plaintiff sought to acquire all documents from January 1, 2017 to May 1, 2017, regarding NMFS's determination that the necropsy requirements of Public Display Permit 774, which authorized the import of the orca whale known as "Tilikum," were extinguished by the 1994 amendments to the MMPA. Defs.' Statement of Material Facts as to which There is No Genuine Dispute ("Defs.' Statement"), ECF No. 20, ¶ 3; Pl.'s Response to Defs.' Statement of Material Facts as to which There is No Genuine Dispute, and Pl.'s Statement of Additional Material Facts as to which There is No Genuine Dispute ("Pl.'s Statement"), ECF

---

[1] Defendants final release of documents in response to Plaintiff's FOIA request contained withholdings pursuant to FOIA Exemptions 5 and 6. FOIA Exemption 6 withholds from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). But, Plaintiff challenges the use of only Exemption 5. *See* Declaration of Mark H. Graff, ECF No. 20-1, ¶¶ 5-6.

[2] The Court's consideration has focused on the following documents:
- Defs.' Mot. for Summary Judgment, ECF No. [20] ("Defs.' Mot.");
- Pl.'s Cross-Mot. for Summary Judgment, Opp'n to Defs.' Mot. for Summary Judgment, and Request for Oral Arg., ECF No. [22-1] ("Pl.'s Mot.");
- Defs.' Reply Mem. in Support of their Mot. for Summary Judgment and Defs.' Opp'n to Pl.'s Cross-Mot. for Summary Judgment, ECF No. [30] ("Defs.' Reply");
- Pl.'s Reply Mem. in Support of Pl.'s Cross-Mot. for Summary Judgment, ECF No. [33] ("Pl.'s Reply").

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCvR 7(f).

No. 23-2, ¶ 3. This FOIA request was the outcome of a long series of discussions between Plaintiff and Defendants as well as other related agencies, including Fish and Wildlife Services ("FWS") and the Marine Mammal Commission ("MMC"), concerning whether or not the 1994 amendments to the MPPA extinguished Public Display Permit provisions that required permittees to provide the necropsies for marine mammals to Defendants.

Beginning in August 2016, Plaintiff met with Defendants and other federal agencies to discuss a draft Issue Paper setting forth Plaintiff's determination that the necropsy and clinical history requirements of pre-1994 Public Display Permits remained in effect despite the MMPA amendments. Pl.'s Statement, ECF No. 23-2, ¶¶ 26-37. The Issue Paper specifically concluded that the necropsy requirement in the Public Display Permit for Tilikum was not affected by the 1994 MMPA amendments. *Id.* at ¶ 28. Plaintiff decided that it would be appropriate to discuss the Issue Paper in various meetings with Defendants, FWS, and MMC. *Id.* at ¶ 26. Plaintiff met separately with representatives from NOAA, NMFS, FWS, and MMC. *Id.* at ¶¶ 33-36. During these meetings, Plaintiff shared the findings and conclusions of the Issue Paper with Defendants and the other agencies. But, in response to a question from a NOAA attorney, Plaintiff told Defendants that litigation to enforce the conclusion of the Issue Paper was not under consideration at that point. *Id.* at ¶ 33; Defs.' Res. To Pl.'s Statement of Additional Material Facts as to which There is No Genuine Dispute ("Defs.' Res."), ECF No. 30-2, ¶ 33.

In November 2016, Plaintiff provided the draft Issue Paper on the Tilikum Public Display Permit to NOAA and the Department of the Interior, which includes FWS. The Issue Paper argued that the clinical history and necropsy provisions in Tilikum's permit remained in effect despite the 1994 amendments to the MMPA. Pl.'s Statement, ECF No. 23-2, ¶ 38; Defs.' Statement, ECF No. 20, ¶ 5. In December 2016, Plaintiff met with various FWS officials to

discuss the draft Issue Paper. FWS counsel asked how the Issue Paper could be enforced in court. Plaintiff responded that there was no intent for litigation, but, if necessary, a lawsuit could be filed under the Administrative Procedure Act. Pl.'s Statement, ECF No. 23-2, ¶ 44; Defs.' Res., ECF No. 30-2, ¶ 44. Plaintiff continued to meet with government officials connected to the MMPA and continued to revise the Issue Paper in response to these conversations. Pl.'s Statement, ECF No. 23-2, ¶¶ 45-47.

On January 6, 2017, Tilikum died at Sea World's Orlando facility following a long illness. Defs.' Statement, ECF No. 20, ¶ 4; Pl.'s Statement, ECF No. 23-2, ¶ 4. Plaintiff informed NMFS by email that, because of Tilikum's death, the necropsy and clinical history report requirements in Tilikum's Public Display Permit were activated. Pl.'s Statement, ECF No. 23-2, ¶ 49. Approximately two weeks after Tilikum's death, Plaintiff requested to meet with Defendants, other federal agencies, and other animal welfare organizations to discuss Tilikum's permit requirements. *Id.* at ¶ 60. Approximately one week later, an attorney with the Office of General Counsel for NOAA responded that Defendants were reviewing the issue internally and would be willing to meet and discuss the issue following an internal review. *Id.* at ¶ 64.

In March 2017, NMFS offered to set up a meeting with Plaintiff and other animal rights groups to discuss the clinical history and necropsy requirements in Tilikum's Public Display Permit. *Id.* at ¶ 72. Prior to the meeting, Plaintiff asked what position NMFS would be setting forth. *Id.* at ¶ 73. In response, NMFS's Deputy Chief of Permits stated that "NMFS believes the necropsy provisions of the 1992 permit were effectively extinguished by the 1994 amendments to the MMPA. … Thus, we will not be enforcing the necropsy-related provisions of the permit. The legal analysis supporting this determination is exempt from disclosure under the attorney-

client privilege, and we will not be discussing it in any detail at the meeting." *Id.* at ¶ 74; Defs.'

Resp., ECF No. 30-2, ¶ 74.[3]

The legal analysis referred to by Defendants was contained in a draft memorandum that was prepared by an attorney in NOAA's Office of the General Counsel in response to a request by the Director of the Office of Protected Resources within NMFS for legal advice and analysis of the arguments made in Plaintiff's Issue Paper. Declaration of Mark H. Graff, ECF No. 20-1, ¶ 7. Plaintiff contends that the memorandum was not a draft but was instead finalized. However, Defendants repeatedly refer to the memorandum as a draft, and there is no evidence that the memorandum was ever finalized. Accordingly, the Court concludes that the memorandum remained a draft.

While NMFS would not share the draft memorandum containing its legal analysis with Plaintiff, it did share the draft memorandum with MMC and with FWS. Pl.'s Statement, ECF No. 23-2, ¶¶ 77-79. Defendants allege that they regularly discussed legal matters with both MMC and FWS to ensure a consistent application of the MMPA. *Vaughn* Index, ECF No. 20-3, 1, 3. Both MMC and legal counsel for FWS provided comments on the draft memorandum. Pl.'s Statement, ECF No. 23-2, ¶¶ 77-79.

Following various meetings between Plaintiff, Defendants, MMC, and FWS, in August 2017, Plaintiff sent NMFS a revised Issue Paper. *Id.* at ¶ 90. This was the first version of the Issue Paper provided to NMFS which was not a draft. The Issue Paper for the first time included

---

[3] In letters responding to additional requests by Plaintiff for necropsies from other pre-1994 permits, Defendants stated that "[j]urisdiction over necropsies and associated reports is the province of [the Animal and Plant Health Inspection Service], under the Animal Welfare Act and its regulations." Pl.'s Statement, ECF No. 23-2, ¶ 93. However, as the Animal and Plant Health Inspection Service is not a party to this lawsuit, no information concerning the Service's regulations on necropsies has been provided.

the language: "If NMFS declines to enforce [Tilikum's permit], NMFS has taken a definitive position construing the meaning of section 5(c) of the 1994 amendments. [] As a result, the NMFS legal interpretation is subject to an APA legal challenge as arbitrary and capricious. For reasons discussed in this paper, NMFS has no valid basis for its position, and is very vulnerable to an APA challenge." *Id.* Defendants continued to refuse to enforce the necropsy requirements in Tilikum's permit as well as in other pre-1994 Public Display Permits. *Id.* at ¶¶ 91-98.

In September 2017, Plaintiff filed FOIA requests with Defendants, FWS, and MMC, asking for documents from each agency between January 1, 2017, and May 1, 2017, regarding NMFS's determination that the necropsy requirements in Tilikum's Public Display Permit were extinguished by the 1994 amendments to the MMPA. *Id.* at ¶ 99; Defs.' Res., ECF No. 30-2, ¶ 99. Defendants did not timely acknowledge the receipt of the FOIA request. Pl.'s Statement, ECF No. 23-2, ¶ 101; Defs.' Res., ECF No. 30-2, ¶ 101. After failing to receive a response, Plaintiff filed this lawsuit on January 9, 2018. *See generally* Compl., ECF No. 1.

In response to Plaintiff's lawsuit, the following day, Defendants sent a letter to Plaintiff providing 58 files as a first interim response. These records had been previously processed and released pursuant to a separate FOIA request. Pl.'s Statement, ECF No. 23-2, ¶ 107; Defs.' Res., ECF No. 30-2, ¶ 107. On February 14, 2018, and February 20, 2018, Defendants made their remaining responses, releasing a total of 471 records with redactions. Pl.'s Statement, ECF No. 23-2, ¶¶ 108-09; Defs.' Res., ECF No. 30-2, ¶¶ 108-09.

However, based on FOIA Exemption 5, Defendants have refused to release the draft memorandum that was prepared by the Office of General Counsel for NOAA, responding to the legal arguments made in Plaintiff's Issue Paper. Whether or not the draft memorandum was rightfully withheld under FOIA Exemption 5 is the issue currently before the Court.

## II. LEGAL STANDARD

Congress enacted FOIA to "pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976) (internal quotation marks omitted). Congress remained sensitive to the need to achieve balance between these objectives and the potential that "legitimate governmental and private interests could be harmed by release of certain types of information." *Fed. Bureau of Investigation v. Abramson*, 456 U.S. 615, 621 (1982). To that end, FOIA "requires federal agencies to make Government records available to the public, subject to nine exemptions." *Milner v. Dep't of Navy*, 562 U.S. 562, 562 (2011). Ultimately, "disclosure, not secrecy, is the dominant objective of the Act." *Rose*, 425 U.S. at 361. For this reason, the "exemptions are explicitly made exclusive, and must be narrowly construed." *Milner*, 562 U.S. at 565 (internal quotation marks and citations omitted).

When presented with a motion for summary judgment in this context, the district court must conduct a "de novo" review of the record, which requires the court to "ascertain whether the agency has sustained its burden of demonstrating the documents requested are ... exempt from disclosure under the FOIA." *Multi Ag Media LLC v. Dep't of Agriculture*, 515 F.3d 1224, 1227 (D.C. Cir. 2008) (internal quotation marks omitted). The burden is on the agency to justify its response to the plaintiff's request. 5 U.S.C. § 552(a)(4)(B). "An agency may sustain its burden by means of affidavits, but only if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Multi Ag Media*, 515 F.3d at 1227 (internal quotation marks omitted). "If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within

the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." *Am. Civil Liberties Union v. U.S. Dep't of Defense*, 628 F.3d 612, 619 (D.C. Cir. 2011). "Uncontradicted, plausible affidavits showing reasonable specificity and a logical relation to the exemption are likely to prevail." *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 509 (D.C. Cir. 2011). Summary judgment is proper when the pleadings, the discovery materials on file, and any affidavits or declarations "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III. DISCUSSION

Plaintiff does not challenge the adequacy of Defendants' search for responsive records to Plaintiff's FOIA request. As such, the sole issue before the Court is whether or not the withheld draft memorandum falls under FOIA Exemption 5. The Court has reviewed the parties' supporting Declarations as well as Defendants' *Vaughn* Index. Considering the arguments of the parties, as well as the Court's own review, the Court concludes that the draft memorandum falls under FOIA Exemption 5 and was properly withheld.

FOIA Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Over the years, it has been construed as protecting "those documents, and only those documents, normally privileged in the civil discovery context." *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). It provides protection to "materials which would be protected under the attorney-client privilege, the attorney work-product privilege, or the executive 'deliberative process' privilege." *Coastal States Gas Corp. v. Dep't of*

*Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980) (internal citations omitted). In this case, Defendants rely on two recognized privileges: the attorney-client privilege and the work-product doctrine.

Under the federal common law, the proponent bears the burden of demonstrating the applicability of any asserted privilege. *In re Subpoena Duces Tecum Issued to Commodity Futures Trading Comm'n WD Energy Servs., Inc.*, 439 F.3d 740, 750 (D.C. Cir. 2006). To meet that burden, the proponent must establish the claimed privilege with "reasonable certainty." *Fed. Trade Comm'n v. TRW, Inc.*, 628 F.2d 207, 213 (D.C. Cir. 1980). Specifically, the proponent must adduce competent evidence in support of "each of the essential elements necessary to sustain a claim of privilege." *Alexander v. Fed. Bureau of Investigation*, 192 F.R.D. 42, 45 (D.D.C. 2000). The proponent "must offer more than just conclusory statements, generalized assertions, and unsworn averments of its counsel." *In re Application of Veiga*, 746 F. Supp. 2d 27, 34 (D.D.C. 2010). Where the proponent fails to adduce sufficient facts to permit the district court to conclude with reasonable certainty that the privilege applies, its burden has not been met. *TRW*, 628 F.2d at 213.

Plaintiff has two arguments as to why FOIA Exemption 5 is not applicable to the draft memorandum. First, Plaintiff argues that the draft memorandum provides the rationale underlying Defendants' final agency action of declining to enforce the necropsy and clinical history requirements in pre-1994 Public Display Permits. Accordingly, Plaintiff contends that withholding the draft memorandum would create a body of "secret law." Second, Plaintiff argues that, even if withholding the draft memorandum would not create a body of secret law, Defendants have not carried their burden of justifying the use of the attorney-client or work-product privileges. The Court will address each of Plaintiff's arguments in turn.

### A. The Creation of "Secret Law"

First, Plaintiff argues that withholding the draft memorandum pursuant to FOIA Exemption 5 would create a body of "secret law." The United States Court of Appeals for the District of Columbia Circuit has recognized that "no private attorney has the power to formulate the law to be applied to others. Matters are different in the governmental context when the counsel rendering the legal opinion in effect is making law." *Tax Analysts v. Internal Revenue Servs.*, 117 F.3d 607, 619 (D.C. Cir. 1997). Where a document is "applied routinely as the government's legal position … FOIA exemption 5 and the attorney-client privilege may not be used to protect this … body of agency law from disclosure to the public." *Id.* In determining whether a document is "working law" requiring disclosure, the Court must consider "the function and significance of the document in the agency's decisionmaking process, the nature of the decisionmaking authority vested in the office or person issuing the disputed document, and the flow of documents." *In Defense of Animals v. Nat'l Inst. of Health*, 543 F. Supp. 2d 83, 104 (D.D.C. 2008) (internal quotation marks omitted).

Plaintiff argues that the draft memorandum was "working law" as it articulated the rationale for Defendants' new, March 2017 policy that the necropsy requirement in Tilikum's permit was extinguished by the 1994 MMPA amendments. Plaintiff contends that Defendants routinely applied the new policy to the deaths of at least four other orcas, refusing to enforce the necropsy requirements in their Public Display Permits for the reasons laid out in the draft memorandum.

But, Plaintiff's argument rests on a faulty premise. The draft memorandum did not establish the rationale for a new policy. Instead, the draft memorandum provided legal support for a policy that Defendants had adopted in practice since approximately 1994. According to the

Declaration of NOAA official Mary O'Brien, "[a]fter the 1994 amendments, NMFS no longer asked pre-1994 permittees for necropsy reports. The 1994 amendments … specified the limited information facilities had to provide for each of their animals. When an animal dies, the facility must only notify NMFS of the date and cause … of death." Declaration of Mary O'Brien, ECF No. 30, 1. Ms. O'Brien went on to explain that, while some smaller facilities continued to attach necropsy reports to their date/cause of death reports after 1994, NMFS did not request the necropsy reports, look at the reports, or enter the information contained in the reports into any sort of electronic database. *Id.*

Plaintiff counters that Ms. O'Brien's Declaration fails to establish that Defendants had a policy of not requiring the submission of necropsy reports following the 1994 MMPA amendments. Instead, Plaintiff argues that, at most, Ms. O'Brien's Declaration shows that Defendants had no policy on the applicability of necropsy permit provisions prior to March 2017. But, the Public Display Permits issued prior to 1994 contained provisions *requiring* permit holders to submit necropsy and clinical history reports to NMFS. Pl.'s Statement, ECF No. 23-2, ¶ 25. If the Public Display Permits had merely allowed NMFS the discretion to request a necropsy report, then Plaintiff's argument that Defendants had no policy on the necropsy permit provisions may have been more persuasive. Instead, the Public Display Permits required the holders to submit the necropsy reports, and Defendants did not enforce that non-discretionary requirement after 1994. Accordingly, the Court concludes that Defendants had a policy of not enforcing the necropsy requirements in Public Display Permits following the 1994 MMPA amendments. Even if this was unwritten, it was a policy in practice.

FOIA Exemption 5 does not protect from disclosure documents that "represent policies, statements or interpretations of law that [an] agency has actually adopted. The purpose of this

limitation is to prevent bodies of 'secret law' from being built up and applied by government agencies." *Schwartz v. Internal Revenue Servs.*, 511 F.2d 1303, 1305 (D.C. Cir. 1975). Here, the Court concludes that the draft memorandum is not a policy or a statement of law which was adopted by Defendants. Instead, Defendants had a preexisting policy of not enforcing the necropsy requirements in pre-1994 Public Display Permits. Given the pre-existing policy of non-enforcement, the draft memorandum served not as a controlling statement of policy that Defendants relied on in discharging their mission. Instead, the draft memorandum constituted legal advice, created by NOAA counsel, advising Defendants of the legal ramifications of continuing their policy of non-enforcement in the face of the legal arguments contained in Plaintiff's Issue Paper.

But, even assuming that Defendants had a pre-existing policy on necropsy requirements in pre-1994 Public Display Permits, Plaintiff argues that the presence of a pre-existing policy is not dispositive. Plaintiff contends that by withholding the draft memorandum, Defendants will enshrine a secret rationale for their regularly-implemented legal conclusion on the retroactive effect of the 1994 MMPA amendments.

But, Plaintiff has shown that the draft memorandum was used in support of only one decision, the decision not to require a necropsy report under Tilikum's permit. And, this was the precise decision on which the draft memorandum was requested to provide legal advice. Plaintiff has not shown that Defendants subsequently relied on the rationale in the draft memorandum when making other decisions. Accordingly, Plaintiff has not shown that withholding the draft memorandum will create a body of regularly-implemented secret law.

The withheld draft memorandum was "prepared in response to a request by the Director of the Office of Protected Resources within NMFS for legal advice and analysis of the arguments

made in an Issue Paper submitted by plaintiff's counsel to NOAA." Declaration of Mark H. Graff, ECF No. 20-1, ¶ 8. Plaintiff's Issue Paper concerned whether or not the necropsy and clinical history requirements of pre-1994 Public Display Permits remained in effect after the MMPA amendments. Specifically, the Issue Paper concluded that "the necropsy/clinical history provision in Tilikum's permit remained in effect and was not affected by the" 1994 amendments. Pl.'s Statement, ECF No. 23-2, ¶ 28. Following the death of Tilikum, Plaintiff repeatedly asked to meet with Defendants to discuss Tilikum's permit requirements. In response, Defendants explained that "NMFS believes the necropsy provisions of the 1992 permit were effectively extinguished by the 1994 amendments to the MMPA…. Thus, we will not be enforcing the necropsy-related provisions of the permit. The legal analysis supporting this determination is exempt from disclosure under the attorney-client privilege." *Id.* at ¶ 74.

The fact that Defendants relied on the legal draft memorandum to support their conclusion that Tilikum's necropsy report requirements had expired does not make the draft memorandum "secret law." An NMFS official asked for legal advice in response to Plaintiff's Issue Paper which concluded that Tilikum's necropsy requirements remained active. Defendants were entitled to rely on that legal advice in informing Plaintiffs that Defendants would not reverse their policy and enforce the necropsy requirements in Tilikum's permit. As used to support Defendants' decision concerning Tilikum, the draft memorandum constitutes legal advice provided to Defendants for the purpose of understanding the legal implications of not requiring the necropsy in the face of Plaintiff's Issue Paper. Defendants' use of the draft memorandum in this way does not transform the draft memorandum into a controlling statement of policy that Defendants repeatedly rely on in discharging their mission. *See Judicial Watch, Inc. v. U.S. Dep't of Defense*, 245 F. Supp. 3d 19, 30-31 (D.D.C. 2017).

But, Plaintiff argues that Defendants did not rely on the draft memorandum in resolving only the dispute over Tilikum's permit requirements. Instead, Plaintiff argues that, following the dispute over Tilikum's necropsy, Defendants repeatedly relied on the draft memorandum to resolve issues relating to the necropsy provisions in the permits of multiple other orcas. Plaintiff alleges that the draft memorandum was referenced and applied no fewer than four separate times as the government's legal position in its dealings with groups arguing in favor of the continued applicability of necropsy requirements in pre-1994 permits.

But, Plaintiff fails to support this allegation. As support, Plaintiff cites letters sent by NMFS in response to Plaintiff's requests for necropsy and clinical history reports of other orcas. In these response letters, NMFS restated its position that the necropsy provisions in pre-1994 permits "were effectively extinguished by the 1994 amendments to the Marine Mammal Protection Act …. Thus, NMFS will not be enforcing the necropsy-related provisions of the permit." Pl.'s Statement, ECF No. 23-2, ¶ 93; *see also* ¶¶ 94, 96, 98. Nowhere in the multiple responses to Plaintiff's petitions did Defendants reference, rely on, or apply the legal draft memorandum. Instead, NMFS reiterated its position, which had been in practice since 1994, that the 1994 amendments to the MMPA extinguished the necropsy and clinical history requirements in pre-1994 Public Display Permits. Plaintiff presents no evidence that the withheld memorandum was ever anything more than a draft used to inform Defendants on the legal implications of Plaintiff's Issue Paper as relates to the necropsy requirement in Tilikum's Public Display Permit. Accordingly, Plaintiff has not established that the draft memorandum constitutes "orders and interpretations which [Defendants] actually appl[y] to cases before [them]." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868-69 (D.C. Cir. 1980) (internal quotation marks omitted).

In further support of its argument that the draft memorandum cannot be withheld under FOIA Exemption 5 as it constitutes secret law, Plaintiff cites to a comment made by MMC's General Counsel in response to Plaintiff's FOIA request to MMC. MMC's General Counsel stated:

> I am sympathetic to the position that your organization [AWI] finds itself in -- the responsible agency (NMFS) has given you its legal conclusion that the 1994 amendments to the MMPA extinguished permit terms and conditions related to necropsies and clinical histories, but has declined to provide you with the rationale for this conclusion. I can see where that agency would not want to share its draft legal analysis outside the government, but once a conclusion has been reached, its final decision is no longer pre-decisional.

Pl.'s Statement, ECF No. 23-2, ¶ 104. Plaintiff argues that this statement from MMC's General Counsel establishes that the draft memorandum was the rationale for Defendants' conclusion that the 1994 amendments to the MMPA extinguished requirements for pre-1994 Public Display Permits. According to Plaintiff, withholding such a rationale would create a body of secret law.

But, Plaintiff's reliance on this statement from MMC's General Counsel is misplaced. First, this statement was made by an MMC official. This official is not a Defendant in the case, nor does this official speak on behalf of Defendants. Second, MMC's General Counsel misunderstood the nature of the draft memorandum. Defendants have provided evidence that they long ago reached the conclusion that the 1994 amendments to the MMPA extinguished pre-1994 permit requirements. *See* Declaration of Mary O'Brien, ECF No. 30-1, 1 ("After the 1994 amendments, NMFS no longer asked pre-1994 permittees for necropsy reports."). The draft memorandum did not provide the rationale for this decision made over a decade before the draft memorandum was written. Instead, the draft memorandum provided legal advice concerning the ramifications of not enforcing Tilikum's necropsy requirements in the face of arguments made in Plaintiff's Issue Paper. There is no evidence that the memorandum was ever "finalized" as

15

official policy, or that the memorandum ever became anything more than a draft legal memorandum prepared to facilitate internal and interagency discussions concerning the findings and conclusions of Plaintiff's Issue Paper on Tilikum's permit requirements. Accordingly, Plaintiff cannot rely on the statement of a non-party as evidence that the draft memorandum constituted Defendants' "final decision" on the applicability of pre-1994 permit requirements.

For the reasons discussed above, the Court concludes that the draft memorandum does not constitute "secret law." Accordingly, the draft memorandum can be withheld under FOIA Exemption 5 if Defendants carry their burden of justifying the use of the attorney-client privilege or the work-product doctrine

## B. Attorney-Client Privilege under FOIA Exemption 5

First, Defendants contend that the requested records fall under FOIA Exemption 5 based on attorney-client privilege. "The attorney-client privilege protects confidential communications from clients to their attorneys made for the purpose of securing legal advice or services," as well as "communications from attorneys to their clients if the communications rest on confidential information obtained from the client." *Tax Analysts*, 117 F.3d at 618 (internal quotation marks omitted). In order to demonstrate the applicability of the privilege, the proponent must establish each of the following essential elements: (1) the holder of the privilege is, or sought to be, a client; (2) the person to whom the communication is made is a member of the bar or his subordinate and, in connection with the communication at issue, is acting in his or her capacity as a lawyer; (3) the communication relates to a fact of which the attorney was informed by his client, outside the presence of strangers, for the purpose of securing legal advice; and (4) the privilege has been claimed and not waived by the client. *In re Sealed Case*, 737 F.2d 94, 98-99 (D.C. Cir. 1984). A "fundamental prerequisite to the assertion of the privilege" is

"confidentiality both at the time of the communication and maintained since." *Coastal States*, 617 F.2d at 863; *accord Fed. Trade Comm'n v. GlaxoSmithKline*, 294 F.3d 141, 146 (D.C. Cir. 2002).

"In the governmental context, the 'client' may be the agency and the attorney may be the agency lawyer." *Tax Analysts*, 117 F.3d at 618; *accord Coastal States*, 617 F.2d at 863 (explaining that attorney-client privilege applies when "the Government is dealing with its attorneys as would any private party seeking advice to protect personal interests, and needs the same assurance of confidentiality so it will not be deterred from full and frank communications with its counselors"). It is well-established, however, that not every communication between an attorney and a client-government or otherwise-is made for the purpose of securing legal advice or services. As this Circuit has explained, "consultation with one admitted to the bar but not in that other person's role as a lawyer is not protected." *In re Lindsey*, 148 F.3d 1100, 1106 (D.C. Cir. 1998) (per curiam) (internal quotation marks omitted). Hence, a government attorney's "advice on political, strategic, or policy issues, valuable as it may [be], would not be shielded from disclosure by the attorney-client privilege." *Id.*

In this case, the Director of the Office of Protected Resources within NMFS requested from an attorney in NOAA's Office of the General Counsel legal advice and analysis of the arguments made in an Issue Paper submitted by Plaintiff to Defendants. In making this request, the NMFS Director was acting in the capacity of a client, requesting legal advice from an attorney in NOAA's Office of the General Counsel. Accordingly, the draft memorandum produced in response to this request for legal advice and analysis falls under the protection of attorney-client privilege.

But, Plaintiff argues that, even if the draft memorandum was privileged, Defendants waived the attorney-client privilege when they disclosed the draft memorandum to third parties. "[D]isclosure of attorney-client or work product confidences to third parties waives the protection of the relevant privileges." *Id.* at 1282. Here, the draft memorandum had been prepared by NOAA's Office of General Counsel for Defendants. But, Defendants distributed the draft memorandum to MMC and FWS, both of which provided comments on the draft memorandum. Pl.'s Statement, ECF No. 23-2, ¶¶ 77-79. Plaintiff argues that Defendants' decision to share the draft memorandum with MMC and FWS destroyed the protections of attorney-client privilege. *See Mead Data Center, Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 253 (D.C. Cir. 1977) (explaining that once "the information has been or is later shared with third parties, the privilege does not apply").

Defendants counter that even if they shared the draft memorandum with MMC and FWS, the draft memorandum is still protected by attorney-client privilege under the consultant corollary and the common interest doctrine. The Court finds that the consultant corollary is not applicable, but the common interest doctrine privileges Defendants' disclosure to MMC and FWS.

Considering first the consultant corollary, FOIA Exemption 5 covers only records that are "inter-agency or intra-agency memorandums or letters." 5 U.S.C. § 552(b)(5). Under the consultant corollary, certain communications between an agency and an outside consultant can be considered "inter-agency or intra-agency" records under FOIA Exemption 5. In order to remain exempt pursuant to the consultant corollary, the records of communications between an agency and outside consultants must have been "created for the purpose of aiding the agency's deliberative process." *Dow Jones & Co., Inc. v. Dep't of Justice*, 917 F.2d 571, 575 (D.C. Cir.

1990); *see also Ryan v. Dep't of Justice*, 617 F.2d 781, 789-90 (D.C. Cir. 1980) ("When an agency record is submitted by outside consultants as part of the deliberative process, and it was solicited by the agency, we find it entirely reasonable to deem the resulting document to be an 'intra-agency' memorandum for purposes of determining the applicability of Exemption 5.").

Accordingly, the consultant corollary expands the threshold issue in applying FOIA Exemption 5: are the requested records "inter-agency or intra-agency memorandums or letters?" 5 U.S.C. § 552(b)(5). Under the consultant corollary, documents shared with outside parties can remain inter-agency or intra-agency records as long as they were shared with an outsider for the purpose of receiving neutral advice. *Ctr. for Int'l envtl. Law v. Office of the U.S. Trade Representatives*, 237 F. Supp. 2d 17, 27 (D.D.C. 2002). Accordingly, while the consultant corollary serves to expand which records meet the threshold requirement of FOIA Exemption 5, the consultant corollary does not expand which records meet the requirements for attorney-client privilege.

The fact that the consultant corollary is not used to expand the bounds of attorney-client privilege is seen in the seminal United States Supreme Court case on the consultant corollary, *Department of the Interior v. Klamath Water Users Protective Association*, 532 U.S. 1 (2001). The Court explained that to qualify under FOIA Exemption 5, "a document must thus satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." 532 U.S. at 8. In prior cases, the Court had "addressed the second condition, incorporating civil discovery privileges." *Id.* But, in *Klamath*, the Court addressed the first condition, that "the communication must be 'inter-agency or intra-agency.'" *Id.* at 9 (quoting 5 U.S.C. § 552(b)(5)). And, in addressing that first condition, the Court assumed

without deciding that the consultant corollary was valid and explained that, under the consultant corollary, "the exemption extends to communications between Government agencies and outside consultants hired by them … [when] the consultant does not represent an interest of its own, or the interest of any other client, when it advises the agency that hires it." *Id.* at 10-11. Accordingly, the Supreme Court interpreted the consultant corollary to apply to Exemption 5's threshold issue, not to the issue of discovery privileges.

The Court's conclusion that the consultant corollary expands the inter-agency or intra-agency requirement of Exemption 5 rather than the breadth of privilege is buttressed by the fact that Defendants cite no case in which the consultant corollary was used to expand the protections of attorney-client privilege or work-product privilege. And, the Court could find no case using the consultant corollary in the method urged by Defendants. *See, e.g., 100Reporters LLC v. U.S. Dep't of Justice*, 248 F. Supp. 3d 115, 149 (D.D.C. 2017) (explaining that, because the third-party with whom the relevant records were shared exercised independent judgment, "the consultant corollary applies and the [] documents are intra-agency documents within the meaning of Exemption 5"); *McKinley v. Bd. Of Governors of Fed. Reserve System*, 647 F.3d 331, 336-39 (D.C. Cir. 2011) (using the consultant corollary to conclude that the "withheld material constitutes 'interagency memorandums or letters' under FOIA Exemption 5"); *Public Emps. for Envtl. Responsibility v. U.S. Section, Int's Boundary and Water Com'n, U.S.-Mexico*, 740 F.3d 195, 201-02 (D.C. Cir. 2014) (explaining that the consultant corollary is used to allow the phrase "intra-agency" to "go beyond the text and include U.S. agency records authored by non-agency entities"); *Nat'l Inst. Of Military Justice v. U.S. Dep't of Defense*, 512 F.3d 677, 680-82 (D.C. Cir. 2008) (using the consultant corollary to find that documents withheld under Exemption 5 were "intra-agency" documents).

However, even if the consultant corollary is not applicable, the Court concludes Defendants' decision to share the draft memorandum with FWS and MMC did not waive the attorney-client privilege because all the agencies shared a common legal interest. In his Declaration, Mark Graff, the FOIA Officer for NOAA, did not rely on the consultant corollary to justify Defendants' sharing of the draft memorandum with MMC and FWS. Instead, Mr. Graff explained that "[a]lthough the memorandum was shared with [FWS] and [MMC], this does not waive the privilege, as all agencies share a common interest in the legal defensibility of the agency decisions regarding the administration of the MMPA." Declaration of Mark Graff, ECF No. 20-1, ¶ 13.

But, Plaintiff contends that the common interest privilege only "'protects communications between a lawyer and two or more clients regarding a matter of common interest.'" *Chesapeake Bay Found., Inc. v. U.S. Army Corps of Engineers*, 722 F. Supp. 2d 66, 73 (quoting *In re Sealed Case*, 29 F.3d at 719). Here, there is no evidence that Defendants and MMC or FWS shared an attorney. Accordingly, Plaintiff contends that the common interest doctrine cannot be used to maintain privilege over the draft memorandum.

The Court finds that Plaintiff construes the common interest privilege too narrowly. While Defendants and MMC and FWS did not share an attorney, they did "have a substantial identity of legal interest." *United States v. Am. Tel. & Tel. Co.*, 86 F.R.D. 603, 617 (D.D.C. 1979). When one agency shares a privileged document with another agency, the sharing of the document can destroy the privilege. However, when "the two agencies have a substantial identity of legal interest in a particular matter, the attorneys for each agency can be treated as representing both agencies jointly." *Id.* Government agencies share a substantial identity of legal interest when they are "engaged in a common effort and [seek] the advice of counsel about

fulfilling their statutory mission." *Modesto Irrigation v. Gutierrez*, No. 1:06-00453, 2007 WL 763370, *17 (E.D. Cal. March 9, 2007).

Considering the responsibilities of and authority exercised by Defendants, MMC, and FWS, the Court concludes that they shared a substantial identity of legal interests in the draft memorandum's subject matter. MMC is an independent oversight agency established by the MMPA to ensure that all federal agencies adhere to the requirements of the MMPA. As an oversight commission, the MMC is tasked with ensuring that the MMPA is properly administered. 16 U.S.C. § 1401-1407. FWS is a bureau within the Department of the Interior with responsibilities under the MMPA similar to NMFS. FWS exercises its responsibility over all marine mammals other than those for which Defendants are responsible. 16 U.S.C. § 1362(12).

The Court finds that Defendants and MMC shared a common legal interest in the proper administration of the MMPA as MMC is tasked with ensuring that all agencies, including Defendants, adhere to the requirements of the MMPA. As such, MMC and Defendants have a common legal interest in the response to the findings and conclusions in Plaintiff's Issue Paper concerning the applicability of pre-1994 permit requirements. Plaintiff makes much of the fact that MMC and Defendants occasionally take different positions on issues under the MMPA. *See* Declaration of Donald C. Baur, ECF No. 28, ¶ 41. But, there is no evidence that Defendants and MMC disagreed on the expiration of pre-1994 permit requirements. Defendants shared the draft memorandum with MMC as part of a deliberative process in formulating a response to the legal issues and implications in Plaintiff's Issue Paper. *See* Pl.'s Statement, ECF No. 23-2, ¶ 78 ("The MMC provided comments on the memorandum.").

Similarly, the Court finds that Defendants and FWS shared a common legal interest in the proper administration of the MMPA. FWS and Defendants have similar responsibilities under the MMPA. The primary difference between their responsibilities is the marine mammals over which each agency exercises its authority. NMFS is responsible for "members of the order Cetacea [including orcas] and members, other than walruses, of the order Pinnipedia." 16 U.S.C. § 1362(12). FWS is responsible for all other marine mammals covered under the MMPA. *Id.*

It is not clear from the record whether or not pre-1994 permits issued by FWS contained the same necropsy and clinical history requirements as those issued by Defendants. An email between NOAA officials states that "I clarified … whether FWS requires that necropsy reports be submitted after the death of marine mammals. She says they do not. Sometimes, apparently, facilities will send them in voluntarily, as part of the 'cause of death' report required for the inventory, but FWS does not require it." Ex. 18, ECF No. 28-2, 87. If pre-1994 FWS permits contained similar necropsy and clinical history requirements as pre-1994 NMFS permits, FWS would clearly have a common legal interest in the applicability of necropsy requirements in pre-1994 permits. But, even if FWS's pre-1994 permits did not contain a similar necropsy requirement, FWS and Defendants still have a common legal interest in the effect of the 1994 MMPA amendments on pre-1994 permits.

Moreover, Defendants allege that they routinely discuss legal matters with respect to the interpretation of the MMPA with both MMC and FWS in order to ensure the consistent application of the statute. *Vaughn* Index, ECF No. 20-3, 1, 3. And, Plaintiff provides no evidence to counter this allegation that Defendants, MMC, and FWS regularly have a common legal interest in matters involving the application of the MMPA.

The Court's conclusion that MMC and FWS have a common legal interest with Defendants is buttressed by Plaintiff's own actions. Plaintiff regularly met with Defendants to discuss the findings and conclusions of the Issue Paper. But, Plaintiff also regularly met separately with MMC and FWS to discuss the same issue. For example on October 4, 2016, Plaintiff met with three officials from MMC to "describe the analysis and preliminary conclusions of the draft Issue Paper and obtain the MMC's comments and criticisms." Pl.'s Statement, ECF No. 23-2, ¶ 34. And on October 21, 2016, Plaintiff met with two attorneys representing FWS, where FWS asked questions and raised issues that the Issue Paper did not address. *Id.* at ¶ 36. Again, on December 6, 2016, Plaintiff conducted a teleconference with FWS counsel who made additional comments on the Issue Paper. *Id.* at ¶ 40. Similarly, on December 14, 2016, Plaintiff again met with MMC to discuss the draft Issue Paper. *Id.* at ¶ 42. The Court has provided only a handful of examples of the numerous instances where Plaintiff independently met with MMC and FWS to discuss the findings and conclusions of the Issue Paper outside the presence of Defendants.

Accordingly, it was Plaintiff who initiated the participation of MMC and FWS in resolving the issue of the applicability of necropsy requirements in pre-1994 permits. If MMC and FWS had no legal interest in the findings and conclusions presented in the Issue Paper, it is not clear why Plaintiff regularly met and conferred with MMC and FWS regarding the Issue Paper. Moreover, given the consistent presence, at Plaintiff's initiation, of MMC and FWS throughout this process, it was reasonable for Defendants to treat MMC and FWS as agencies with shared responsibility over the issues presented in Plaintiff's Issue Paper and over Defendants' draft memorandum responding to that Issue Paper.

The Court concludes that the draft memorandum was rightfully withheld under Exemption 5 pursuant to attorney-client privilege. The draft memorandum was created by NOAA's Office of General Counsel following Defendants' request for legal advice and analysis concerning Plaintiff's Issue Paper. As such, the draft memorandum enjoys attorney-client privilege. This privilege was not waived when the draft memorandum was shared with MMC and FWS as those agencies shared a common legal interest with Defendants.

### C. Work-Product Doctrine under FOIA Exemption 5

Second, Defendants argue that the requested documents also fall under FOIA Exemption 5 based on the work-product doctrine. The work-product doctrine protects materials "prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3)(A). The purpose of the work-product privilege is to ensure that "a lawyer [can] work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel," and to permit attorneys to "assemble information, sift what [they] consider[ ] to be the relevant from the irrelevant facts, prepare [their] legal theories and plan [their] strateg[ies] without undue and needless interference." *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947).

In assessing whether the proponent has carried its burden under the work-product doctrine, the relevant inquiry is "whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Equal Emp't Opportunity Comm'n v. Lutheran Soc. Servs.*, 186 F.3d 959, 968 (D.C. Cir. 1999) (internal quotation marks omitted). This inquiry encompasses two related but distinct concepts-one a question of timing and the other a question of intent. *U.S. ex rel. Fago v. M & T Mortg. Corp.*, 242 F.R.D. 16, 18 (D.D.C. 2007). The

former, the temporal element, asks whether there was "a subjective belief that litigation was a real possibility" at the time the document was prepared and whether that belief was "objectively reasonable." *Lutheran Soc. Servs.*, 186 F.3d at 968 (internal quotation marks omitted). The latter, the motivational element, demands that the document be prepared or obtained because of the prospect of litigation. *Id.* In this respect, the proponent bears the burden of "showing that the documents were prepared for the purpose of assisting an attorney in preparing for litigation, and not some other reason." *Alexander*, 192 F.R.D. at 46.

Plaintiff has two arguments as to why the work-product doctrine is not applicable to the draft memorandum. First, Plaintiff argues that Defendants have failed to prove that the draft memorandum was "prepared in anticipation of litigation." Fed. R. Civ. P. 26(b)(3)(A). Second, Plaintiff argues that Defendants' decision to share the draft memorandum with MMC and FWS waived the protections of the work-product doctrine. The Court will address both arguments in turn.

First, the Court concludes that the draft memorandum was prepared in anticipation of litigation. The draft memorandum was prepared in response to a request by the Director of the Office of Protected Resources within NMFS to NOAA's Office of General Counsel for legal advice and analysis of the arguments made in an Issue Paper submitted by Plaintiff. Plaintiff's Issue Paper concluded that the necropsy and clinical history provisions in Tilikum's permit remained in effect and were not eliminated by the 1994 amendments to the MMPA. Pl.'s Statement, ECF No. 23-2, ¶ 28. Since 1994, Defendants had a policy of not requiring necropsy reports from pre-1994 permittees. Declaration of Mary O'Brien, ECF No. 30-1, 1. Accordingly, Defendants already held an established position which directly conflicted with the arguments in Plaintiff's Issue Paper. Following the death of Tilikum, Defendants could have, and did,

reasonably anticipate that Plaintiffs would use the legal arguments in their Issue Paper to initiate a lawsuit to force Defendants to reverse their position and to require Tilikum's necropsy report. Accordingly, the Court concludes that the draft memorandum was prepared in anticipation of litigation.

Plaintiff argues that the draft memorandum was not prepared in anticipation for litigation because Plaintiff's purpose in meeting with Defendants and in sharing the draft Issue Paper "was merely to urge the agency to consider the continued viability of necropsy/clinical history reporting requirements in permits." Pl.'s Opp'n, ECF No. 22-1, 22. Plaintiff also points out that when asked on October 3, 2016 by a NOAA Office of General Counsel attorney how the Issue Paper could be enforced through litigation, Plaintiff responded that "litigation was not under consideration at that point." Pl.'s Statement, ECF No. 23-2, ¶ 33. And again on December 16, 2016, when asked by FWS counsel how the Issue Paper could be enforced in court, Plaintiff responded that "there was no desire or intent to bring litigation … [but] if necessary, a lawsuit could be filed under the Administrative Procedure Act." *Id.* at ¶ 44. Plaintiff further explains that it was not until August 14, 2017 that the revised Issue Paper for the first time included the language "if NMFS declines to enforce Permit No. 774, NMFS has taken a definitive position construing the meaning of section 5(c) of the 1994 amendments. [] As a result, the NMFS legal interpretation is subject to an APA legal challenge as arbitrary and capricious." *Id.* at ¶ 90.

But, it does not matter that Plaintiff had not made a specific threat of litigation against Defendants at the time the draft memorandum was prepared. *See In re Sealed Case*, 146 F.3d 881, 885-888 (D.C. Cir. 1998) (not requiring a specific claim when government lawyers act "as legal advisors protecting their agency clients from the possibility of future litigation"). After reading Plaintiff's draft Issue Paper, Defendants knew that Plaintiff had taken a position on the

continued viability of Tilikum's permit requirements that directly contradicted Defendants' position. Following Tilikum's death, the question of the validity of the permit's necropsy requirement was ripe. *See* Pl.'s Statement, ECF No. 23-2, ¶ 53 (describing a letter sent by Plaintiff and other organizations to Defendants noting that Tilikum's permit requirements had activated and "discussing the importance of enforcing the permit"). With full knowledge of Plaintiff's interest and position, Defendants reasonably anticipated litigation and requested from counsel legal advice and analysis of the arguments made in Plaintiff's Issue Paper. *See* Declaration of Mark H. Graff, ECF No. 21-1, ¶¶ 7, 21. As such, this is a case where "the client asked the lawyer to review a matter the client feared could lead to litigation, and the lawyer, knowing critics were scrutinizing [Defendants' decision not to require Tilikum's necropsy report], prepared documents in anticipation of litigation over exactly that [issue]." *In re Sealed Case*, 146 F.3d at 886. Accordingly, despite the lack of an explicit threat from Plaintiff, the Court concludes that the draft memorandum was prepared in anticipation of litigation.

The Court now turns to Plaintiff's second argument as to why the draft memorandum is not privileged under the work-product doctrine. Plaintiff argues that, even if the draft memorandum was prepared in anticipation of litigation, the work-product privilege was waived when Defendants shared the draft memorandum with MMC and FWS.

For reasons that the Court has already explained, the consultant corollary cannot protect Defendants' work-product privilege against disclosure to third-parties. *See Supra* Sec. III.B. The consultant corollary extends Exemption 5's threshold requirement that the withheld records be "inter-agency or intra-agency memorandums or letters." 5 U.S.C. § 552(b)(5). The consultant corollary does not extend the work-product privilege to third parties. Lacking the protection of

the consultant corollary, the Court will address Defendants' other argument for maintaining the privilege despite disclosure-the common interest doctrine.

The Court has already addressed the common interest doctrine as it pertains to attorney-client privilege. *See Supra* Sec. III.B. The common interest doctrine also protects documents shared with third-parties which would otherwise be protected by the work-product doctrine. *See U.S. v. Deloitte LLP*, 610 F.3d 129, 141 (D.C. Cir. 2010). But, it is not clear if the common interest doctrine under attorney-client privilege is coextensive with the common interest doctrine under work-product privilege. *See U.S. v. Am. Tel. and Tel. Co.*, 642 F.2d 1285, 1299 (D.C. Cir. 1980) ("We do not consider the strict standard of waiver in the attorney-client privilege context … to be appropriate for work product cases."). Accordingly, the Court will evaluate whether or not Defendants' common interest argument can maintain the draft memorandum's work-product privilege despite sharing the draft memorandum with MMC and FWS.

In contrast to attorney-client privilege, the work-product doctrine "does not exist to protect a confidential relationship, but rather to promote the adversary system by safeguarding the fruits of an attorney's trial preparation from the discovery attempts of the opponent." *Id.* Accordingly, "[a] disclosure made in the pursuit of such trial preparation, and not inconsistent with maintaining secrecy against opponents, should be allowed without waiver of the privilege." *Id.* But, work-product privilege cannot survive disclosure to any and all third-parties. Instead, the "transferor and transferee must anticipate litigation against a common adversary on the same issue or issues." *Id.*

Here, there is evidence that Defendants disclosed the draft memorandum to MMC and FWS in order to advance their trial preparation and in a way that would maintain secrecy against opponents. As was previously explained, Defendants, MMC, and FWS all have a common legal

interest in the proper administration of the MMPA. MMC is an independent oversight agency, tasked with ensuring that Defendants, and other related agencies, adhere to the requirements of the MMPA, which includes the requirements in pre-1994 permits. 16 U.S.C. § 1401-1407. FWS exercises a similar authority as Defendants under the MMPA, but FWS's authority extends over a different group of marine mammals. 16 U.S.C. § 1362(12). Even with this small difference, FWS would have a legal interest in the way that the 1994 amendments to the MMPA affected pre-1994 permits. In fact, Defendants allege, and Plaintiff did not contradict, that Defendants, MMC, and FWS routinely discuss legal matters concerning the interpretation of the MMPA in order to ensure a consistent application of the statute. *Vaughn* Index, ECF No. 30-3, 1, 3.

Moreover, MMC and FWS had a common legal interest in the draft memorandum because Plaintiff involved all of the agencies in the development of the Issue Paper. Plaintiff regularly met with and conducted teleconferences with both MMC and FWS independent of Defendants. *See, e.g.*, Pl.'s Statement, ECF No. 23-2, ¶¶ 34, 36, 40, 42. As Plaintiff held separate discussions with MMC and FWS on the Issue Paper, it was reasonable for Defendants to contemplate that MMC and FWS may have different insights into the Issue Paper. Accordingly, it was also reasonable for Defendants to share the draft memorandum, which was drafted in response to the Issue Paper, with MMC and FWS to get their unique comments and insights. *See Id.* ¶¶ 78, 79 (explaining that MMC and FWS provided comments on the draft memorandum). Because Plaintiff regularly and continuously involved MMC and FWS in discussions concerning the effect of the 1994 MMPA amendments, all of the agencies developed a common legal interest in ensuring that Defendants' refusal to reverse the policy on the applicability of requirements in pre-1994 permits was proper under the MMPA.

Moreover, there is no evidence to show that Defendants' disclosure to MMC and FWS risked disclosure to opponents. While Defendants may have, at times, clashed with MMC over the proper administration of the MMPA, there is no evidence that the agencies disagreed over the effect of the 1994 MMPA amendments on pre-1994 permit requirements. Additionally, as all agencies had a common legal interest in the proper administration of the MMPA, there was little concern that sharing the draft memorandum with MMC and FWS would lead the draft memorandum to be disclosed to others not sharing that common interest. Accordingly, Defendants' decision to share the draft memorandum with MMC and FWS did not waive the work-product privilege.

The Court concludes that the draft memorandum was produced in anticipation of litigation and is privileged under the work-product doctrine. The Court also concludes that sharing the draft memorandum with MMC and FWS did not waive the privilege as all agencies shared a common legal interest. Accordingly, Defendants are entitled to withhold the draft memorandum in reliance on work-product privilege under FOIA Exemption 5.

Because the draft memorandum was properly withheld under Exemption 5 pursuant to work-product privilege, the Court does not need to conduct a segregability analysis. *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 432 F.3d 366, 371 (D.C. Cir. 2005) (explaining that "[i]f a document is fully protected as work product, then segregability is not required"). While it is possible that the draft memorandum may contain factual or other background information not related the attorney's analysis and evaluation, "[t]he circuit's case law is clear that the work-product doctrine simply does not distinguish between factual and deliberative material." *Id.* (internal quotation marks omitted).

### D. Related Emails

The Court's above analysis has focused on whether or not Defendants rightfully withheld the draft memorandum under FOIA Exemption 5. For the reasons given, the Court concludes that both attorney-client privilege and the work-product doctrine, as applicable under FOIA Exemption 5, protect the draft memorandum from disclosure. But, the draft memorandum is not the only record which Defendants withheld under FOIA Exemption 5. Defendants also claim that FOIA Exemption 5 applies to 34 other records, all of which are either drafts of the memorandum or emails transmitting the draft memorandum. *Vaughn* Index, ECF No. 20-3.

It is unclear to the Court whether or not the withholding of the additional 34 records requires judicial action. Defendants state that "the only matter requiring judicial decision is whether a draft memorandum on this issue prepared by the Office of General Counsel, National Oceanic and Atmospheric Administration ('NOAA'), together with associated comments and related emails, must be produced to Plaintiff." Defs.' Mot., ECF No. 20, 1. But, Defendants' argument focuses exclusively on the draft memorandum, with no mention of the related records. Furthering the Court's confusion, Plaintiff states that "this case presents a single, straightforward question: did [NMFS] properly withhold a 16-page memorandum [] under [FOIA]?" Pl.'s Mot., ECF no. 22-1, 1. And, Plaintiff asks only that the Court "order that the Memorandum … be disclosed." *Id.* at 3. Like Defendants, Plaintiff makes no arguments concerning the withholding or the release of the 34 related records.

As the Court is unable to determine whether or not the parties request judicial action on the 34 withheld records related to the draft memorandum, the Court will not rule on this issue at this time. Instead, in its Order accompanying this Memorandum Opinion, the Court will order

the parties to submit a Joint Status Report, informing the Court whether or not further judicial action is required on the 34 withheld records relating to the draft memorandum.

## IV.    CONCLUSION

For the reasons stated above, the Court concludes that the draft memorandum was rightfully withheld under FOIA Exemption 5 pursuant to the attorney-client and work-product privileges. Accordingly, the Court GRANTS Defendants' motion for summary judgment and DENIES Plaintiff's motion for summary judgment. A separate Order accompanies this Memorandum Opinion.

_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge
